UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

GENASYS INC., a Delaware
Corporation,

Plaintiff,

v.

VECTOR ACOUSTICS, LLC, a
Delaware limited liability company;
HERNAN FREDERICK LOPEZ, an
individual; MARCEL NAUJOK, an
individual; DOES 1 through 10,

Defendants.

Case No.:  22-CV-152 TWR (BLM)

**ORDER (1) DENYING DEFENDANT
LOPEZ'S MOTION TO DISMISS;
(2) GRANTING DEFENDANT
LOPEZ'S MOTION TO COMPEL
ARBITRATION; (3) DENYING
DEFENDANT LOPEZ'S MOTION
FOR ATTORNEYS' FEES; AND
(4) GRANTING IN PART AND
DENYING IN PART DEFENDANT
NAUJOK'S MOTION TO DISMISS**

(ECF Nos. 28, 31)

Presently before the Court is the Motion (1) to Dismiss the First Cause of Action of Plaintiff's First Amended Complaint, (2) to Compel the Arbitration of Any Claims Arising Out of the Separation Agreement, and (3) for Attorneys' Fees and Costs Under Specific Circumstances filed by Defendants Vector Acoustics, LLC ("Vector") and Hernan Frederick Lopez (ECF No. 28, "Lopez Mot."), along with Defendant Marcel Naujok's Motion to Dismiss Plaintiff's First Amended Complaint (ECF No. 31, "Naujok Mot."). Also before the Court are Plaintiff Genasys Inc.'s Oppositions to the Motions (ECF No. 37, "Opp'n Naujok Mot."; ECF No. 38, "Opp'n Lopez Mot.") and Defendants' Replies in support of the respective Motions (ECF No. 40, "Naujok Reply"; ECF No. 41, "Lopez

Reply"). The Court held a hearing on April 27, 2023. (*See* ECF No. 42.) After the hearing, the Court gave the Parties notice of its tentative opinion on the Motion to Compel Arbitration and requested responses to that tentative opinion. (ECF No. 43.) As a result, also before the Court are Plaintiff's Response to the Tentative Opinion (ECF No. 44) and Defendant Lopez's Response to the Tentative Opinion (ECF No. 45). Having carefully considered the First Amended Complaint, the Parties' arguments, and the relevant law, the Court **DENIES** Defendants Vector and Lopez's Motion to Dismiss; **GRANTS** Defendant Lopez's Motion to Compel Arbitration; **DENIES** Defendants Vector and Lopez's Motion for Attorneys' Fees; and **GRANTS IN PART AND DENIES IN PART** Defendant Naujok's Motion to Dismiss.

## BACKGROUND

### I.    Factual Background[1]

Plaintiff ("Genasys") is a "leader in the Acoustic Hailing Device Industry ('AHD Industry') and develops and manufactures large-scale communication systems such as emergency warning systems and public safety mass notification systems."[2] (ECF No. 22, "FAC," ¶ 9.) Its products are "used by various governmental and commercial organizations throughout the world." (*Id.*)

In 2003, Genasys hired Defendant Lopez and he eventually became Plaintiff's Vice President of Product Development and was responsible for the development and improvement of Plaintiff's products. (*Id.* ¶ 11.) Lopez worked at Genasys until June 2019. (*Id.* ¶ 42.) In 2013, Genasys hired Defendant Naujok as its Vice President of Business Development—Pacific Rim and he was responsible for overseeing a substantial portion of Genasys' customer network. (*Id.* ¶ 16.) Naujok was Genasys' employee until October

---

[1]    For purposes of Defendants' Motions to Dismiss, the facts alleged in Plaintiff's First Amended Complaint are accepted as true. *See Vasquez v. Los Angeles County*, 487 F.3d 1246, 1249 (9th Cir. 2007).

[2]    "Before changing its name to 'Genasys Inc.' in January of 2020, Genasys was originally named 'American Technology Corporation' and then 'LRAD Corporation.'" (FAC ¶ 2.)

2018, at which point he "requested that his employment be terminated and that he instead work as an independent contractor for Genasys through a limited liability company he had formed named AugenTek, LLC." (*Id.* ¶ 18.) "Genasys accepted Naujok's request and Naujok's employment was terminated in October 2018." (*Id.* ¶ 19.) "Naujok continued to provide various consulting services for Genasys through AugenTek, LLC from October 2018 until May 2021 ('the Representative Period').["3] (*Id.*)

"Genasys requires all employees to sign a Proprietary Information and Inventions Agreement for Employees ('PIIA')" and both Lopez and Naujok signed such an agreement. (*Id.* ¶¶ 12–13, 16; *see* ECF 22 at 26–39 ("Ex. A"); ECF No. 22 at 40–51 ("Ex. B").[4]) Among other things, Lopez and Naujok—in exchange for employment with Genasys— each agreed that he would "surrender to the Company, at its request, or at the conclusion of [his] employment, all accounts, notes, data, sketches, drawings and other documents and records, and all material and physical items of any kind, including all reproductions and copies thereof, which relate in any way to the business, products, practices or techniques of the Company or contain Confidential Information, whether or not created by [him], or which come into [his] possession by reason of [his] employment with the Company, and [he] agree[d] further that all of the foregoing are the property of the Company." (Ex. A ¶ 10; Ex. B ¶ 10.) Similarly, "manufacturing representatives, such as AugenTek, LLC, are contractually required to promptly return to Genasys all documents, materials, and tangible property supplied by Genasys at the time their representation is terminated." (FAC ¶ 41.)

---

[3]    Plaintiff and Defendant Naujok dispute whether Naujok's employment ended in October 2018— Naujok recently notified Genasys that he believes he was misclassified as an independent contractor during the Representative Period. (*See* FAC ¶ 20.) Naujok has begun the process of filing a complaint for violation of the California Labor Code in the Superior Court of California for the City and County of San Diego. (*See* ECF No. 22 at 53 ("Ex. C").) Like Defendant Naujok, (*see* ECF No. 31-1 ("Naujok Mem.") at 14), in considering Naujok's Motion to Dismiss, the Court accepts as true Plaintiff's allegation that Naujok's employment ended in October 2018. *See Vasquez*, 487 F.3d at 1249.

[4]    Throughout this Order, pin citations refer to the CM/ECF pagination stamped at the top of each page.

Further, through their respective PIIAs, Lopez and Naujok also agreed that each would "at all times, both during and after the termination of [his] employment for any reason whatsoever (whether with or without cause), to hold in the strictest confidence, and not to use, publish, or to disclose to any person, firm, or corporation without written authorization of the Board of Directors of the Company, any past, present, or future techniques, know-how, designs, drawings, processes, experimental, and development work, inventions, trade secrets, developments, machinery, research activities and plans, prices, software, cost of production, equipment, prototypes, *sales and customer information, customer and prospect lists*, and business and financial information relating to the business, products, practices and techniques of the Company or any of its affiliates, clients, consultants, or licensees." (Ex. A ¶ 3.1 (emphasis added); *see* Ex. B ¶ 3.1.) Finally, as relevant to the instant Motions, the PIIAs contain a severability clause stating that if any provision of the PIIAs is found by a court or arbitrator to be invalid or unenforceable, it will not affect the other provisions of the agreements and the other provisions will be construed as if the invalid or unenforceable provision were omitted. (Ex. A ¶ 20; Ex. B ¶ 20.)

"During their time working for Genasys, Lopez and Naujok received a significant amount of documents, records, and other material from Genasys that relate to the business, products, practices, or techniques of Genasys, or contain confidential information." (FAC ¶ 21.) Two main documents Lopez and Naujok had access to are the "Channel Report" and the "Army Presentation Materials." (*Id.* ¶¶ 27–28, 38.)

The Channel Report is a Microsoft Excel document that contains the following information about Genasys customers that serve as resellers or prospective sellers of Genasys' products: "information about each customer's geographic scope, information about the product preferences and product needs of these customers, and detailed contact information for these customers, such as the representative who is the primary contact for that customer and how best to reach that person." (*Id.* ¶¶ 31, 34, 36.) The Channel Report specifically "identifies the various resellers and potential resellers by region and contains

certain personal email addresses, phone numbers, and mailing addresses; nonpublic information about Genasys' contracts with the resellers, such as the contract execution and expiration dates; the representative who is the primary contact for the company; and certain unpublished and private notes or comments related to Genasys' business with particular companies, together with Genasys' plans with respect to future dealings with certain companies." (*Id.* ¶ 35.)  This report is regularly updated with assistance from Genasys' sales personnel, is "extremely confidential, and is not publicly available." (*Id.* ¶¶ 34, 36.) This report "represents countless hours curating internal business development information." (*Id.* ¶ 37.)  Genasys alleges that it owns the Channel Report and the information contained therein and it therefore constitutes Genasys' property under the PIIAs Lopez and Naujok signed.  (*Id.* ¶ 40.)

As for the Army Presentation Materials, on May 8, 2019, the United States Army "held a programmatic review with Genasys in which the Army made a presentation to Genasys regarding the Army's use of . . . Genasys Products and, in particular, the various vehicles and ships . . . on which . . . Genasys Products are mounted." (*Id.* ¶ 22.)  After this programmatic review, the Army provided Genasys with a copy of certain slides in its presentation, which Genasys refers to as the "Army Presentation Materials." (*Id.* ¶ 23.) "These slides were prepared specifically for Genasys' use and shared exclusively with Genasys," such that Genasys alleges it owns them and they constitute Genasys' property under the PIIAs.  (*Id.* ¶¶ 24–25.)  Genasys carefully guarded the Army Presentation Materials, and they were only shared with limited people within the Company.  (*Id.* ¶ 26.) The day after the presentation, an executive at Genasys emailed these materials to Lopez in his role as the Vice President of Product Development.  (*Id.* ¶ 27.)  Naujok must have also received a copy because images from the Army Presentation Materials were located within an electronic file that Naujok prepared or maintained during his time with the company.  (*Id.* ¶ 28.)

As Lopez's time with Genasys came to an end, Lopez agreed in a "Separation and Release Agreement" effective June 28, 2019, that he was resigning and that he "must

immediately return all Company property and documents (including all embodiments of proprietary information) and all copies thereof in [his] possession or control."  (ECF No. 22 at 58–60 ("Ex. D"); FAC ¶ 42.)  Then on July 1, 2019, Lopez signed a "Certification of Obligations upon Termination of Employment" stating he had "returned all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, blue/redlines, sketches, materials, equipment, including but not limited to a laptop computer, mobile phone, and keys, and other documents or property, belonging to LRAD Corporation."  (ECF No. 22 at 62 ("Ex. E"); FAC ¶ 43.)  Genasys alleges that despite signing the PIIA, the Separation and Release agreement, and the Certification of Obligations upon Termination of Employment, following his resignation, "Lopez retained Genasys' property and documents including, but not necessarily limited to, the Army Presentation Materials and the Channel Report."  (FAC ¶ 44.)

As for Naujok, "[a]fter terminating his employment initially in October 2018, Naujok sent Genasys a letter, dated May 7, 2021, in which he terminated the Representative Period—[the period in which he was providing consulting services for Genasys through AugenTek LLC]—and he informed Genasys that all Genasys material [would] be returned."  (*Id.* ¶¶ 19, 45; *see* ECF No. 22 at 64 ("Ex. F").)  Despite signing the PIIA and representing that all Genasys material would be returned, Naujok failed to surrender Genasys materials to Genasys either at the conclusion of his employment in 2018 or after the Representative Period terminated.  (FAC ¶ 46.)  Material that Naujok failed to return "includes, but is not necessarily limited to, the Channel Report, information mined therefrom, or Genasys' accumulation of customer contact information rendered in some other fashion, as well as other property of Genasys, such as electronic files containing customer sales information and presentation materials."  (*Id.*)  Genasys also alleges that "on multiple occasions, Naujok was found in Genasys' engineering lab" taking photographs of Genasys products that had not been released to the market and that Naujok failed to surrender those photographs to Genasys.  (*Id.* ¶ 47.)

/ / /

Meanwhile, in January 2020, Lopez formed Vector Acoustics, LLC, a business that designs and manufactures loudspeakers and audio systems for "[c]hallenging [a]pplications."  (*Id.* ¶¶ 48–49.)  Naujok assisted Lopez with Vector's business and marketing.  (*Id.* ¶ 50.)  Genasys alleges that Vector's products are reproductions of its own products with "superficial alterations" and that "Lopez and Naujok used and relied on substantial information and materials they had wrongfully retained from Genasys in designing, manufacturing, and/or marketing" the Vector products.  (*Id.* ¶¶ 51–52.)  For example, in 2021, "Defendants prepared presentation materials to market [their products] in which they inserted material, including, but not necessarily limited to, the Army Presentation Materials," which had been improperly retained from Genasys.  (*Id.* ¶ 53.)  Specifically, Defendants inserted two images from the Army Presentation Materials into their own presentation materials that "detail how . . . Genasys Products are mounted to the Army's land and sea Platforms."  (*Id.* ¶ 54.)  "Both Lopez and Naujok participated in the creation of" Vector's presentation materials.  (*Id.* ¶ 55.)  Defendants also "sent personalized email messages to contacts for various regions listed on the Channel Report, including but not necessarily limited to, Japan and Canada, soliciting business for" Vector.  (*Id.* ¶ 56.)  "The email addresses used by Defendants for the contacts in Japan and Canada are not publicly available and there does not appear to be any independent method that Defendants could have obtained the personal e-mail addresses of these individuals other than through their access to or use of the Channel Report."  (*Id.* ¶ 57.)

Furthermore, Genasys alleges Vector "has been spreading misinformation regarding . . . Genasys Products to one or more of Genasys' customers or potential customers."  (*Id.* ¶ 58.)  "For instance, through much of 2021, Genasys was negotiating with the Taiwanese Coast Guard and providing it with demonstration equipment of the . . . Genasys Products."  (*Id.* ¶ 59.)  "However, in or around September 2021, a representative of Vector Acoustics named Gregory Almeida made a presentation to the Taiwanese Coast Guard, in which he incorrectly claimed that Genasys' patents" on certain products had expired.  (*Id.*)  "In addition, Defendants prepared product comparisons that purport to compare" Vector's

products with Genasys' products that "make incorrect, untrue, and false statements" about Genasys' products.  (*Id.* ¶¶ 60–61.)  For example, the product comparisons state that "the input power for the LRAD 450XL speaker is '12–24 VDC Only' and that the input power for the LRAD 500X-RE is '24–28 VDC.'"  (*Id.* ¶ 61.)   According to Plaintiff, these "statements are incorrect, untrue, and false because they suggest that [Genasys products] have less capability than they actually have."  (*Id.*)   Further, Defendants were aware that these statements were incorrect, untrue, and false at the time they created the product comparisons and at the time the product comparisons were distributed "because Lopez and Naujok know the true capabilities of these products from having worked with them in either the design or marketing process during their time at Genasys."  (*Id.* ¶ 62.)  Gregory Almeida, on behalf of Vector, distributed these false product comparisons to the Taiwanese Coast Guard in September 2021 and they may have been distributed to other third parties. (*Id.* ¶ 63.)

## II.   Procedural History

After Plaintiff filed its initial Complaint, (ECF No. 1), Defendants Lopez and Vector moved to dismiss Plaintiff's Complaint, (ECF No. 11).  Defendant Naujok also moved to dismiss Plaintiff's Complaint.  (ECF No. 10.)  The Court granted in part and denied in part Defendants' motions to dismiss.  (*See* ECF No. 21.)  Specifically, the Court found (1) the PIIAs' noncompete provisions that Plaintiff relied on to argue Naujok and Lopez breached their contracts were void and unenforceable under California Business and Professions Code § 16600; (2) even if those provisions were not void, Plaintiff failed to adequately state a claim for breach of contract; (3) Plaintiff failed to plead with sufficient particularity its trade secret claims; (4) Plaintiff's unjust enrichment claim as alleged was preempted by California's Uniform Trade Secret Act; (5) Defendants' motion to dismiss Plaintiff's unfair competition claim was premature; and (6) Defendant Naujok's request for attorneys' fees was also premature.  (*Id.* at 11–15, 17–24.)  The Court granted Plaintiff leave to file an amended complaint.  (*Id.* at 25.)

/ / /

Plaintiff then filed a timely First Amended Complaint, (*see* FAC), alleging the following causes of action: (1) breach of contract (against Lopez); (2) breach of contract (against Naujok); (3) violation of California's Uniform Trade Secrets Act ("CUTSA"), Cal. Civ. Code § 3426 et seq.; (4) violation of the Defend Trade Secrets Act ("the DTSA"), 18 U.S.C. § 1836 et seq.; (5) unjust enrichment; and (6) unfair business practices in violation of California Business and Professions Code § 17200 et seq.   (FAC ¶¶ 67–136.) Defendants Lopez and Vector move to dismiss claim one pursuant to Federal Rule of Civil Procedure 12(b)(6) and move to compel arbitration of that claim as it relates to Lopez's Separation Agreement.   (Lopez Mot. at 2; ECF No. 28-1 ("Lopez Mem.") at 2.)   Defendants Lopez and Vector also request that the Court award them attorneys' fees as outlined in the PIIA if the Court does not find the entire PIIA void and unenforceable.   (Lopez Mem. at 8.)   In their Motion to Dismiss, Defendants Lopez and Vector "reserve[d] the right to join in any motion to dismiss pertaining to the FAC made by Defendant Marcel Naujok, should Mr. Naujok file such a motion."   (*Id*. at 3 n.2.)   Defendant Naujok subsequently moved to dismiss claims two through six of Plaintiff's First Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).   (Naujok Mot. at 2; *see* Naujok Mem. at 8–9.)   Defendants Lopez and Vector then filed a notice of joinder explaining that they were joining Defendant Naujok's motion to dismiss as to claims three through six of Plaintiff's First Amended Complaint.[5]   (ECF No. 32.)

---

[5]      While acknowledging that the Court has discretion to consider Defendants Vector and Lopez's "joinder," Plaintiff argues that this joinder is improper under Federal Rule of Civil Procedure 12(g)(2), which states that "a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion." (*See* Opp'n Lopez Mot. at 24–26); *see Graduation Sols. LLC v. Luya Enter. Inc.*, No. CV 19-1382-DMG (JPRx), 2021 WL 2349346, at *2 (C.D. Cal. Mar. 31, 2021) (finding that Rule 12(g)(2) likely applies to a party's attempt to join a motion containing arguments "that could and should have been brought" in the party's initial motion and noting that "it is not error for the district court to decide the merits of a Rule 12(b)(6) motion [that has been joined] where such a decision [would] 'materially expedite[] the district court's disposition of the case, which [is] a benefit to both parties'" (citation omitted)). While Defendants Lopez and Vector's "joinder" of Naujok's Motion to Dismiss is not necessarily proper, is not entirely helpful, and does not provide details specific to those Defendants, because claims three through six of Plaintiff's First Amended Complaint are brought generally against all Defendants, the Court can rule on

# LEGAL STANDARDS

## I. Federal Rule of Civil Procedure 12(b)(6)

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted 'tests the legal sufficiency of a claim.'" *Conservation Force v. Salazar*, 646 F.3d 1240, 1241–42 (9th Cir. 2011) (quoting *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)). "A district court's dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) is proper if there is a 'lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory.'" *Id.* at 1242 (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988)).

"Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). In other words, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged— / / /

---

Naujok's Motion as written, applying it to all Defendants where appropriate. The Court thus exercises its discretion to rule on the merits of Defendants Lopez and Vector's joinder of Naujok's Motion.

but it has not 'show[n]'—'that the pleader is entitled to relief.'"   *Id.* at 679 (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2)).

"If a complaint is dismissed for failure to state a claim, leave to amend should be granted 'unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency.'"   *DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992) (quoting *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986)).   "A district court does not err in denying leave to amend where the amendment would be futile."   *Id.*

## II.   Motion to Compel Arbitration

If a suit is proceeding in federal court, the party seeking arbitration may move the district court to compel the resisting party to submit to arbitration pursuant to their private agreement to arbitrate the dispute.   *See* 9 U.S.C. § 4.   The Federal Arbitration Act ("FAA") reflects both a "liberal federal policy favoring arbitration" and the "fundamental principle that arbitration is a matter of contract."   *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (citations omitted); *see Circuit City Stores, Inc. v. Adams*, 279 F.3d 889, 892 (9th Cir. 2002) ("The [FAA] not only placed arbitration agreements on equal footing with other contracts, but established a federal policy in favor of arbitration.").   In determining whether to compel a party to arbitrate, the Court may not review the merits of the dispute; rather, the Court's role under the FAA is limited to "determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue."   *Cox v. Ocean View Hotel Corp.*, 533 F.3d 1114, 1119 (9th Cir. 2008) (citation omitted); *see Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 460 (Ct. App. 2021) ("Under both federal and state law, the threshold question presented by a petition to compel arbitration is whether there is an agreement to arbitrate."); *see also Cunico Corp. v. Custom Alloy Corp.*, No. CV 14-1234 PA (AJWx), 2017 WL 8793221, at *9 (C.D. Cal. Dec. 15, 2017) ("In California, an arbitration provision 'must clearly and unambiguously show that the party has agreed to resolve disputes in a forum other than the judicial one.'" (citation omitted)).

"Courts must apply state contract law in determining whether a valid agreement to arbitrate exists." *Hofer v. Emley*, No. 19-CV-02205-JSC, 2019 WL 4575389, at *5 (N.D. Cal. Sept. 20, 2019); *see Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630–31 (2009). And the party seeking to compel arbitration "has the initial burden of demonstrating that a valid agreement exists to arbitrate the claims at issue." *Hofer*, 2019 WL 4575389, at *4; *see Engalla v. Permanente Med. Grp., Inc.*, 15 Cal. 4th 951, 972 (1997); *see also Ashbey v. Archstone Prop. Mgmt., Inc.*, 785 F.3d 1320, 1323 (9th Cir. 2015). "The party opposing arbitration then 'bears the burden of proving by a preponderance of the evidence any defense' to enforcing the agreement." *Hofer*, 2019 WL 4575389, at *4 (citation omitted); *see Engalla*, 15 Cal. 4th at 972.

## ANALYSIS

### I.    Vector and Lopez's Motion to Dismiss and Motion to Compel Arbitration[6]

Plaintiff's breach of contract claim against Defendant Lopez alleges that Lopez breached the PIIA and the Separation Agreement by (1) failing to surrender the Army Presentation Materials and Channel Report, including information improperly mined from the Channel Report; (2) wrongfully retaining information about customers serving as regional resellers; and (3) failing to surrender and then using materials retained from his employment to design and manufacture Vector products. (FAC ¶¶ 70–72.) Plaintiff claims Lopez's failure to properly surrender Genasys' property "is a direct cause of such materials coming into the hands of Vector Acoustics and being used by Vector Acoustics to negatively impact Genasys' relationships with current and potential customers." (*Id*. ¶ 74.)

///

///

///

---

[6]    Vector and Lopez's Motion to Dismiss only seeks dismissal of Plaintiff's first cause of action for breach of contract against Defendant Lopez. (*See generally* Lopez Mot.)   It is not clear what role Defendant Vector has with respect to the Motion.

1   Defendant Lopez moves to dismiss part of Plaintiff's breach of contract claim and

2   moves to compel arbitration of part of that claim.[7]   First, Lopez argues that Plaintiff's

3   breach of contract claim based on the PIIA fails as a matter of law because this Court

4   already found the PIIA, as a whole, void and unenforceable. (Lopez Mot. at 2; Lopez Mem.

5   at 4–6.)  Second, Lopez contends that any claims arising under the Separation Agreement

6   must be arbitrated according to the terms of the Separation Agreement. (Lopez Mot. at 2;

7   Lopez Mem. at 6–8.)

8   ### A.   *Proprietary Information and Inventions Agreement*

9   Defendant Lopez contends that in its prior order, the Court "unambiguously found

10   that the [PIIA], which Plaintiff identified by name and quoted at length in the original

11   Complaint, violated California Business and Profession Code Section 16600 and was

12   therefore void and unenforceable." (Lopez Mem. at 4 (citation omitted).)  Lopez suggests

13   that "[a]ny reasonable person reading the Court's Order would clearly understand that the

14   entire PIIA was void and unenforceable, including any provisions masquerading as a

15   confidentiality provision but which in reality was an overly broad prohibition on

16   competition and employee mobility." (*Id.*)  Lopez asserts that Plaintiff's attempt to reallege

17   his breach of contract claim is sanctionable.  (*Id.* at 5.)  Finally, Lopez briefly argues in the

18   alternative that the provision of the PIIA now at issue in the First Amended Complaint is

19   also "clearly void itself" because it is "part and parcel of the overall pattern to squelch

20   competition and halt employee mobility." (*Id.*)  In a footnote, Lopez asks the Court to refer

21   back to his motion to dismiss Plaintiff's original Complaint where he "cited numerous

22   California cases that struck down confidentiality provisions that were overbroad and that

23   had the effect of improperly stifling employee mobility and competition." (*Id.* at 5 n.4.)

24   / / /

25

26

27   _____

     [7]   While Lopez categorizes his Motion to Compel as a motion to dismiss, different standards apply

28   to each type of motion.  The Court thus addresses Lopez's Motion to Dismiss and Motion to Compel
     separately.

Plaintiff counters that Lopez's request to dismiss its first cause of action improperly relies on the "law of the case" doctrine and that the Court did not find the entire PIIA void and unenforceable.  (Opp'n Lopez Mot. at 6, 12–16.)  Instead, the Court found the agreements referenced in Plaintiff's initial Complaint void as alleged.  (*Id.* at 6, 13.)  Further, Plaintiff argues, the PIIA contains a severability clause that states: the "invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions hereof, and this Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted." (*Id.* at 13; Ex. A ¶ 20.)  Plaintiff also contends that the enforcement of the "company materials" clause in the PIIA is enforceable because it "does not restrain Lopez from pursuing any future vocation simply because he is required at the conclusion of his employment to surrender to Genasys those materials that came into his possession by reason of his employment with Genasys." (Opp'n Lopez Mot. at 14.)  In fact, Plaintiff argues, "there appear to be no cases suggesting that a requirement that employees surrender company materials at the conclusion of their employment violates Section 16600 or any other rule or principle of law." (*Id.* (emphasis omitted).)

As for the Parties' arguments about the Court's prior Order, neither Party, through the original Complaint or during the prior motion practice, provided the Court with the entire PIIA.  The only parts of the PIIA the Court relied on as the "employment agreements" were two noncompete/restrictive covenant provisions that the Court found void and unenforceable and one provision about attorneys' fees. (*See* ECF No. 21 at 2–3, 13–14.)  The original Complaint and the prior motion practice revolved around those two provisions and did not discuss the rest of the PIIA, including the severability provision.[8] The Court now has access to the entire PIIA, which is attached to Plaintiff's First Amended Complaint.  (*See* Ex. A.)  In its First Amended Complaint, Plaintiff alleges a violation of a

---

[8] At the hearing, Lopez stated the PIIA was attached to his prior moving papers.  (*See* ECF No. 42.) The Court's independent review of the record, however, shows the PIIA was not attached to any of the prior moving papers.  (*See* ECF Nos. 10-11, 14-17.)

different provision of the PIIA, (*see* FAC ¶¶ 14, 68), which it is allowed to do since the Court gave Plaintiff leave to amend to cure deficiencies in the original Complaint, (*see* ECF No. 21 at 25); *see Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1043 (9th Cir. 2018) ("Accepting the district court's invitation, plaintiffs filed an amended complaint, and included facts and claims that were different from those in the initial complaint."); *id*. ("[W]hen an original complaint is dismissed without prejudice, the filing of an amended complaint does not ask the court to reconsider its analysis of the initial complaint.  The amended complaint is a new complaint, entitling the plaintiff to judgment on the complaint's own merits.").

Defendant Lopez's argument that the Court found the entire PIIA void and unenforceable is misplaced—the Court could not have made that finding without knowing the extent of the PIIA.  It is axiomatic that an order from the Court cannot stand for a proposition it did not consider.  Lopez all but concedes this point in his Reply (albeit in a different context) stating, "Because Plaintiff[] chose to hide the PIIA and other unidentified agreements by not attaching them to the [original] Complaint or properly identifying them in [the original] Complaint, the actual agreements "at issue" were unclear.  (Lopez Reply at 6.)  "From the record, the Court could not determine whether there might be an enforceable agreement between the parties that could be the subject of a proper cause of action for breach of contract."[9]  (*Id*. at 6–7.)  Therefore, the Court declines to dismiss Plaintiff's claim for breach of the PIIA based on Lopez's argument that the Court previously found the entire PIIA void and unenforceable.

---

[9]      In fact, Defendant Lopez' prior motion to dismiss specifically argued that the Court should find *the terms and conditions referenced in the original Complaint*, not the entire PIIA, void under Section 16600.  (*See* ECF No. 11-1 at 10 ("[T]he incomplete recitation contained in the Complaint is enough for the Court to determine that the terms and conditions that Plaintiff references in its Complaint are overly broad, not limited to the protection of trade secrets, and are therefore void under Section 16600."); *see also id*. at 16 ("The nonsolicitation and noncompetition clauses are unenforceable under § 16600 and overly broad.  Plaintiff cannot state a plausible claim based on Defendants' alleged breach of those clauses.").)

1    The question before the Court then is whether the "Severability" and "Surrender of

2    Materials" provisions of the PIIA are enforceable.[10]  (*See* Ex. A ¶¶ 10, 20.)  Lopez does

3    not directly address this issue.  (*See* Lopez Mem. at 5 & n.4.)  The Court could deny

4    Lopez's motion to dismiss Plaintiff's breach of contract claim for this reason alone.  *See*

5    *John-Charles v. California*, 646 F.3d 1243, 1247 n.4 (9th Cir. 2011) (stating that where

6    party "has failed to develop any argument" on an issue, the party has waived the argument);

7    *see also Twilio, Inc. v. Telesign Corp.*, 249 F. Supp. 3d 1123, 1162 (N.D. Cal. 2017) (same).

8    In any event, the Court proceeds to review this issue on the merits.

9    Pursuant to California Civil Code § 1599, "[w]here a contract has several distinct

10    objects, of which one at least is lawful, and one at least is unlawful, in whole or in part, the

11    contract is void as to the latter and valid as to the rest."  "[T]he dispositive question is

12    whether 'the central purpose of the contract' is so tainted with illegality that there is no

13    lawful object of the contract to enforce."  *Chun Ping Turng v. Guaranteed Rate, Inc.*, 371

14    F. Supp. 3d 610, 632 (N.D. Cal. 2019) (citation omitted); *see Pokorny v. Quixtar, Inc.*, 601

15    F.3d 987, 1005 (9th Cir. 2010) (Under California law, "a court has discretion to either sever

16    an unconscionable provision from an agreement, or refuse to enforce the agreement in its

17    entirety."), *overruled in part on other grounds by Poublon v. C.H. Robinson Co.*, 846 F.3d

18    1251, 1265–66 (9th Cir. 2017).  Severability "clauses evidence the parties' intent that, to

19    the extent possible, the valid provisions of the contracts be given effect, even if some

20    provision is found to be invalid or unlawful."  *Chun Ping Turng*, 371 F. Supp. 3d at 632

21    (quoting *Baeza v. Superior Court*, 201 Cal. App. 4th 1214, 1230 (Ct. App. 2011)).  The

22    "presence of a severability clause makes severance more feasible."  *Id.* (citation omitted).

23    Furthermore, the plain language of California Business and Professions Code § 16600

24    "evidences the legislature['s] intent to sever invalid portions of contracts."  *VibrantCare*

25    *Rehab., Inc. v. Deol*, No. 2:20-CV-00791-MCE-AC, 2021 WL 1614692, at *5 (E.D. Cal.

---

[10]    Defendant Lopez does not argue that if those provisions are enforceable, the First Amended Complaint still fails to state a claim.

Apr. 26, 2021).  Pursuant to Section 16600, "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind *is to that extent* void." Cal. Bus. & Prof. Code § 16600 (emphasis added).

Here, the PIIA Lopez signed has a severability clause explaining that if any provision of the PIIA is found by a court or arbitrator to be invalid or unenforceable, it will not affect the other provisions of the agreement and the PIIA "shall be construed in all respects as if such valid or unenforceable provision were omitted."  (Ex. A ¶ 20.)  Plaintiff argues that given this provision in the PIIA, "Lopez was fully aware that even if some portions of the PIIA could be found to be void, the Company Materials provision would survive."  (Opp'n Lopez Mot. at 13.)  Defendant Lopez makes no argument about the PIIA's severability provision or its effect on the PIIA.  (*See generally* Lopez Mot.; Lopez Mem.; Lopez Reply.) As such, and given the plain language of Section 16600, which the Court previously relied on to find two provisions of the PIIA void and unenforceable, the Court finds the two unenforceable provisions severable from the PIIA.  *Cf. Kyocera Corp. v. Prudential-Bache Trade Servs., Inc.*, 341 F.3d 987, 1002 (9th Cir. 2003) ("Under the circumstances, we find that the offending clauses must, in the interests of justice, be severed from the remainder of the contract.").

Per the First Amended Complaint, Plaintiff's breach of contract claim relating to the PIIA is based on Defendant Lopez's alleged breach of the "Surrender of Materials" provision of the PIIA, including the wrongful retention of customer information.  (FAC ¶¶ 14, 68.)  Without further explanation, Defendant Lopez states that "the provision asserted by Plaintiff to be enforceable in its FAC" is "part and parcel of the overall pattern to squelch competition and halt employee mobility and is therefore also unenforceable." (Lopez Mem. at 5.)  Defendant Lopez also adds a footnote explaining that in his prior motion to dismiss, he cited numerous cases that have struck down "confidentiality provisions that were overbroad and had the effect of improperly stifling employee mobility and competition."  (*Id.* at 5 n.4 (citing *Brown v. TGS Mgmt. Co., LLC*, 57 Cal. App. 5th 303, 319 (Ct. App. 2020)).)  But Lopez does not explain how a provision requiring its

22-CV-152 TWR (BLM)

employees to surrender company materials at the termination of their employment improperly squelches competition or halts employee mobility or is similar to the confidentiality provisions in the cases he cites. *Cf. VibrantCare Rehab., Inc.*, 2021 WL 1614692, at *6 ("The non-disclosure clause seeks to prevent employees from disclosing material that would damage the company. It does not, by its own terms, seek to limit the future employment of an employee, nor does it suffer from 'overbreadth.' Employees can comply with the non-disclosure clause and still work in their chosen fields." (citation omitted)). In fact, during the hearing, Lopez conceded that he was not aware of any legal authority finding a "Surrender of Materials" provision void under Section 16600. (*See* ECF No. 42.) The Court is also not aware of any such legal authority. Lopez also conceded at the hearing that the breach of contract claim based on the "Surrender of Materials" provision could proceed as alleged. (*See id.*) The Court therefore **DENIES** Defendant Lopez's Motion to Dismiss Plaintiff's breach of contract claim *as it relates to the PIIA*.

## B.   *Separation and Release Agreement*

Defendant Lopez further argues that the Court should compel Plaintiff to arbitrate any claims arising under the Separation Agreement—including Plaintiff's allegation that Lopez breached that agreement by failing to surrender Plaintiff's materials—because the Separation Agreement contains an arbitration clause.[11] (Lopez Mem. at 6.) Plaintiff contends that Lopez has failed to meet his burden of establishing the existence of a clear and unambiguous agreement to arbitrate because the Separation Agreement is not a standalone arbitration agreement and it refers to a "Mutual Agreement to Arbitrate," which expressly excludes this dispute from arbitration. (Opp'n Lopez Mot. at 16–18.) Further, Plaintiff argues that even if there was a clear and unambiguous arbitration provision that encompassed this dispute, the Court should, in its discretion, deny Lopez's Motion to

---

[11]    In passing and without any factual support, Defendant Lopez claims he was forced to sign the Separation Agreement. (Lopez Mem. at 6.) But Lopez does not argue the Separation Agreement is somehow unenforceable or unconscionable. In fact, he requests that the Court compel arbitration based on the Separation Agreement. (*Id.*)

Compel arbitration pursuant to California Code of Civil Procedure § 1281.2(c).  (*Id.* at 19–23.)

As is relevant to the instant Motion, Lopez signed a Separation Agreement upon the termination of his employment with Genasys.  (*See* FAC ¶ 42; Ex. D.)  That Agreement references an agreement to arbitrate stating that Lopez "acknowledge[s] the Mutual Agreement to Arbitrate between [himself] and the Company and agree[s] to that Mutual Agreement to Arbitrate's validity and application to any dispute arising under this Agreement."  (Ex. D at 59 (emphasis omitted).)

Plaintiff did not attach the Mutual Agreement to Arbitrate ("MAA") to its Complaint but did attach it to its Opposition papers.  (*See* ECF No. 38-1 at 6–9 ("Ex. 2").)  Defendant Lopez argues that because the MAA was not referenced or attached to the First Amended Complaint, the Court cannot consider it when ruling on his Motion to Dismiss.  (Lopez Reply at 9–10.)  But Defendant Lopez is not moving to dismiss based on the Separation Agreement; he is moving to compel arbitration.  Thus, the standard Defendant Lopez relies on is inapplicable.  *See Fraher v. Verizon Wireless Servs., LLC*, No. 21-cv-00763-H-JLB, 2021 WL 2525732, at *2 (S.D. Cal. June 21, 2021) ("While the Court may not review the merits of the underlying case in deciding a motion to compel arbitration, it may consider the pleadings, documents of uncontested validity, and affidavits submitted by either party." (citation omitted)).  In his moving papers, Lopez does not contest the validity of the MAA and instead seeks to reserve his right to brief any issues related to the MAA until the MAA is properly before the Court.  (Lopez Reply at 9–10.)  This is an odd approach since Lopez, as the party requesting the Court to compel arbitration, has the burden of demonstrating to the Court the existence of a valid agreement to arbitrate that encompasses the dispute at issue.  *See supra* p. 12.  Lopez's application of the incorrect standard has complicated his request for the Court to compel arbitration and the Court cannot comprehensively rule on the motion to compel unless it addresses the MAA, which the Parties discussed more thoroughly at the hearing and in their Responses to the Court's tentative opinion.

/ / /

*1.*     *Whether a Valid Arbitration Agreement Exists that Encompasses the Dispute at Issue*

The relevant provisions of the MAA state:

(1) **Agreement to Arbitrate Certain Disputes and Claims** Except as specified below, we agree to arbitrate before a single neutral arbitrator any and all disputes or claims arising from or relating to Employee's recruitment to or employment with the Company, or the termination of that employment, including claims against any current or former agent or employee of the Company, whether the disputes or claims arise in tort, contract, or pursuant to a statute, regulation, or ordinance now in existence or which may in the future be enacted or recognized, including, but not limited to, the following claims: . . . claims for fraud, promissory estoppel, fraudulent inducement of contract or *breach of contract* or contractual obligation, whether such alleged contract or obligation be oral, written, or express or implied by fact or law. (Ex. 2 at 6 (emphasis added); *see also* ECF No. 38-2 at 9–12 ("Ex. 3").)[12]

(2) **Claims Not Subject to Arbitration** We further understand and agree that the following disputes and claims are not covered by this Agreement and shall therefore be resolved as required by the law then in effect: . . . Either party's claims concerning the validity, infringement, enforceability, disclosure or misappropriation of any trade secret, patent right, copyright, trademark, or any other intellectual or confidential property held or sought by the Employee or the Company. (Ex. 2 at 6–7 (emphasis omitted); *see also* Ex. 3 at 10.)

(3) **Governing Law** We understand and agree that this Agreement and its validity, construction, and performance shall be governed by the laws of the State of California, without reference to rules relating to conflicts of law. We further understand and agree that any dispute(s) and claim(s) to be arbitrated under this Agreement shall be governed by the laws of the State of California. (Ex. 2 at 8; *see also* Ex. 3 at 11.)

(4) **Severability** We understand and agree that if any term or portion of this Agreement shall, for any reason, be held to be invalid or unenforceable or to be contrary to public policy or any law, then the remainder of this Agreement shall not be affected

---

[12] The signed MAA Plaintiff provided is poor quality and difficult (but not impossible) to read. (*See* Ex. 2.) Plaintiff provided a legible unsigned copy of the MAA that is contained within Lopez's employee file. (Ex. 3; ECF No. 38-2 at 2.) From what the Court can tell, the agreements are nearly identical. For ease of reference, the Court includes cites to both the signed and unsigned versions of the MAA throughout this Order.

by such invalidity or unenforceability but shall remain in full force and effect, as if the invalid or unenforceable term or portion thereof had not existed within this Agreement.  (Ex. 2 at 8; *see also* Ex. 3 at 12.)

(5) **Complete Agreement** We understand and agree that this Agreement contains the complete agreement between the Company and Employee regarding the subjects covered in it; that it supersedes any and all prior representations and agreements between us, if any; and that it may be modified only in a writing, expressly referencing this Agreement and Employee by full name, and signed by the Chief Executive Officer of the Company.  Any such written modification must also state the intention of the parties to modify this Arbitration Agreement.  (Ex. 2 at 8; *see also* Ex. 3 at 12.)

Neither Party argues that this arbitration agreement is invalid or unenforceable.  The Court thus finds, based on the documents provided, that a valid agreement to arbitrate exists.

Plaintiff, however, argues that the dispute at issue is explicitly excluded from the requirement to arbitrate under the arbitration agreement.  (Opp'n Lopez Mot. at 17–18.) Specifically, Plaintiff argues that "[b]y claiming that Lopez failed to surrender Genasys' materials, Genasys is claiming that Lopez misappropriated its property (both confidential and not confidential)" and since "the MAA expressly excludes the misappropriation of confidential property from arbitration, the MAA (and by extension, the Separation Agreement) can hardly be said to clearly and unambiguously encompass the dispute over whether Lopez failed to surrender Genasys' materials." (*Id*. at 18.)  In his moving papers, Lopez does not respond to this argument except through a footnote briefly stating (and reserving the right to further argue) that the MAA unfairly excludes some claims (those that favor employers) from the arbitration agreement while forcing other claims (those that favor employees) to arbitration.  (Lopez Reply at 10 n.3.)  The Court need not address the potential unconscionability of the MAA's exceptions to arbitration because the MAA's plain language shows that the Parties' dispute falls under one of the provisions requiring arbitration that Defendant Lopez seeks to enforce.  Through the MAA, the Parties agreed to arbitrate claims for "breach of contract or contractual obligation." (Ex. 2 at 6.)  Lopez

seeks to compel arbitration of Plaintiff's breach of contract claim arising under the Separation Agreement—a claim that falls directly within the MAA.  (Lopez Mem. at 8.) Plaintiff's argument to the contrary improperly conflates its breach of contract claim with its separate claim for misappropriation.  The Court therefore finds that a valid arbitration agreement exists that encompasses the Parties' breach of contract dispute relating to the Separation Agreement.

> ### 2. Whether California Code of Civil Procedure § 1281.2(c) Applies Such That the Court Is Not Required to Compel Arbitration

Plaintiff argues that even if there is a valid arbitration agreement that encompasses the dispute at issue, the MAA incorporates California Code of Civil Procedure § 1281.2(c) into the agreement such that the Court has discretion to compel arbitration of the claim at issue but is not required to compel arbitration.  (Opp'n Lopez Mot. at 19–23.)  Pursuant to Section 1281.2(c), courts are not required to compel arbitration, if "[a] party to the arbitration agreement is also a party to a pending court action or special proceeding with a third party, arising out of the same transaction or series of related transactions and there is a possibility of conflicting rulings on a common issue of law or fact."  Cal. Civ. Proc. Code § 1281.2(c).

Under the FAA, however, where an arbitration agreement exists that encompasses the dispute at issue, courts have no discretion to deny a motion to compel arbitration unless a ground for revocation of the contractual agreement exists.  *See Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985); *see also Hofer*, 2019 WL 4575389, at *9 ("The FAA does not permit a court to decline to enforce a valid arbitration provision, even if some claims arising from the same transaction or occurrence cannot be compelled to arbitration. . . .  Under such circumstances the FAA 'requires piecemeal resolution when necessary to give effect to an arbitration agreement.'" (citation omitted)).  And "[w]hen an agreement falls within the purview of the FAA, there is a 'strong default presumption . . .

/ / /

/ / /

that the FAA, not state law, supplies the rules for arbitration.'"[13]  *Johnson v. Gruma Corp.*, 614 F.3d 1062, 1066 (9th Cir. 2010) (citation omitted).  "To overcome that presumption, parties to an arbitration agreement must evidence a 'clear intent' to incorporate state law rules for arbitration."  *Id*. (quoting *Fid. Fed. Bank, FSB v. Durga Ma Corp.*, 386 F.3d 1306, 1311 (9th Cir. 2004)); *see Hofer*, 2019 WL 4575389, at *9 ("Parties may agree to state law rules for arbitration even if such rules are inconsistent with those set forth in the [FAA]." (citation omitted)); *see also Cape Flattery Ltd. v. Titan Maritime, LLC*, 647 F.3d 914, 921 (9th Cir. 2011) (instructing that "courts should apply federal arbitrability law absent 'clear and unmistakable evidence' that the parties agreed to apply non-federal arbitrability law").

A general choice-of-law clause in a contract is insufficient to overcome the presumption that the FAA governs.  *Johnson*, 614 F.3d at 1066.  Even general references to California law in an arbitration provision are, on their own, insufficient to overcome the presumption.  *See Fid. Fed. Bank*, 386 F.3d at 1312.  Rather, "the parties must explicitly state their intent to incorporate California law *as it relates to arbitration*."  *ValueSelling Assocs., LLC v. Temple*, No. 09-CV-1493-JM (MDD), 2011 WL 2532560 at *2 (S.D. Cal. June 23, 2011).  *Compare Johnson*, 614 F.3d at 1067 (finding California Arbitration Act ("CAA") applicable where contract specifically required arbitration to be "conducted and subject to enforcement pursuant to the provisions of California Code of Civil Procedure section 1280 through 1295 [the CAA]"), *with Fid. Fed. Bank, FSB*, 386 F.3d at 1312 (finding FAA controlling where arbitration clause merely stated that "[d]isputes or controversies shall be submitted to and resolved by binding arbitration in accordance with the laws of the State of California and the rules of the American Arbitration Association").

Furthermore, some district courts have concluded that because California Code of Civil Procedure § 1281.2(c) affects California's "allocation of power between alternative tribunals," parties to an arbitration agreement must make specific reference to that

---

[13]   Plaintiff does not argue that the MAA falls outside the purview of the FAA if the Court finds California procedural law inapplicable.

particular procedural law "in their agreement in order to effectively incorporate it into their contract." *Stone & Webster, Inc. v. Baker Process, Inc.*, 210 F. Supp. 2d 1177, 1187–88 (S.D. Cal. 2002); *see Shulman v. Kaplan*, No. CV 19-05413-AB (FFMx), 2020 WL 2748022, at *6 (C.D. Cal. Jan. 28, 2020) ("[T]he . . . Agreement makes no express mention of the CAA or Section 1281.2, despite citing other California procedural rules. . . . Accordingly, in light of current Ninth Circuit precedent, the Court finds that the parties' arbitration agreement does not evince a clear intent to depart from the FAA rules.").[14]

Here, Plaintiff argues the MAA explicitly "provides that California law applies to arbitrations under the MAA" because the Parties agreed that the MAA and "its validity, construction and performance shall be governed by the laws of the State of California, without reference to rules relating to conflicts of law" and "any dispute(s) and claim(s) to be arbitrated under this Agreement shall be governed by the laws of the State of California, without reference to rules relating to conflicts of law." (Opp'n Lopez Mot. at 19, 21 (quoting Ex. 2 at 8).) Plaintiff contends this MAA provision is "not just a generic choice-of-law provision." (*Id.* at 21.) Rather, it "is an express adoption of California law for disputes subject to arbitration." (*Id.*) Plaintiff further points to a provision in the MAA that states, "To the extent that . . . anything in this Agreement conflicts with any arbitration procedures required by California law, the arbitration procedures required by California law shall govern." (*Id.* (quoting Ex. 2 at 7).) At the hearing, Defendant Lopez argued the FAA applies here, (*see* ECF No. 42), and his moving papers focus on equitable concerns

---

[14] The court in *Shulman* notes that California state courts and courts in the Ninth Circuit diverge on how they interpret agreements containing potentially conflicting choice-of-law and procedural arbitration rules. *See Shulman*, 2020 WL 2748022, at *6. California courts have found that Section 1281.2(c) is not a "special rule limiting the authority of arbitrators" and therefore arbitration agreements are not required to specifically reference the statute for it to apply; whereas the Ninth Circuit in *Wolsey, Ltd. v Foodmaker, Inc.*, 144 F.3d 1205, 1212 (9th Cir. 1998), found that Section 1282.1(c) does affect California's allocation of power between tribunals, so if a contract does not contain a specific reference to Section 1281.2(c), the FAA governs the arbitration provision. *Shulman*, 2020 WL 2748022, at *6 (citation omitted); *see id.* (noting *Wolsey* is both controlling and more persuasive); *see also BioMagic, Inc. v. Dutch Bros. Enters., LLC*, 729 F. Supp. 2d 1140, 1146–49 (C.D. Cal. 2010) (same).

regarding Plaintiff's request that the Court exercise its discretion not to compel arbitration, (*see* Lopez Reply at 10–11).

   While Plaintiff is correct that the MAA provides that its validity, construction, and performance shall be governed by the laws of the State of California, and the MAA specifically cites certain California procedural rules like California Code of Civil Procedure §§ 1283.05 and 1285.8, the MAA does not specifically reference Section 1281.2(c).  A strict reading of the Ninth Circuit's opinion in *Wolsey* and district court cases interpreting *Wolsey* require the arbitration provisions to specifically reference Section 1281.2(c).  *See Shulman*, 2020 WL 2748022, at *6 (explaining that even though the parties' agreement stated, "The construction, performance, and enforcement of this Agreement shall be governed by *the laws of the State of California*," and "[t]he parties shall each have the right of discovery in connection with any arbitration proceeding in accordance with the *California Code of Civil Procedure, Section 1283.05*," Section 1281.2(c) did not apply because the agreement made "no express mention of the CAA or Section 1281.2(c), despite citing other California procedural rules" (citation omitted)).  Because the MAA makes no express reference to Section 1281.2(c) or the CAA more broadly, the Court finds that that the MAA lacks clear intent to incorporate that law into the agreement and to depart from the FAA.  The Court thus finds the FAA applies, which "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc.*, 470 U.S. at 218.  Accordingly, the Court **GRANTS** Defendant Lopez's Motion to Compel Arbitration of Plaintiff's breach of contract claim *as it relates to the Separation Agreement*.

   In any event, even if California Code of Civil Procedure § 1281.2(c) were incorporated into the MAA, its provisions would not be met here such that the Court would have discretion to compel arbitration.  And even if the provisions were met, the Court would not be inclined to exercise its discretion not to compel arbitration.

/ / /

As noted, Section 1281.2(c) provides courts discretion when "[a] party to the arbitration agreement is also a party to a pending court action or special proceeding with a third party, arising out of the same transaction or series of related transactions and there is a possibility of conflicting rulings on a common issue of law or fact." Cal. Civ. Proc. Code § 1281.2(c). Here, while Plaintiff is also suing Defendant Naujok such that it is involved in a court action with a third party, Plaintiff's claims against Naujok do not arise out of the same transaction or series of related transactions such that there is a possibility of conflicting rulings on a common issue of law or fact. This is true for a few reasons. First, the only claim Defendant Lopez seeks to compel to arbitration is Plaintiff's breach of contract claim as it relates to the Separation Agreement/MAA. Plaintiff does not bring a similar claim against Naujok: Plaintiff's breach of contract claim against Naujok does not involve a Separation Agreement or MAA, it only involves a breach of the PIIA that Naujok signed. Second, Naujok and Lopez independently signed contracts with Plaintiff and Plaintiff's claims against each Defendant will require separate and independent factual analyses. Third, the facts regarding Defendants Lopez and Naujok are different because Naujok's employment ended in October 2018, whereas Lopez's employment ended in June 2019. As a result, even if the Court found Section 1281.2(c) incorporated into the MAA, Plaintiff has not shown that it should apply here. And even if it did apply, the analytical landscape between Plaintiff's breach of contract claims against Lopez and Naujok is sufficiently different, such that the Court would decline to exercise its discretion not to compel arbitration. This is just another reason the Court **GRANTS** Defendant Lopez's Motion to Compel Arbitration of Plaintiff's breach of contract claim as it relates to the Separation Agreement. To the extent Plaintiff wishes to seek a stay of the case pending arbitration, it may file a motion for such a stay.

### 3. Whether the Separation Agreement Subsumes the PIIA

In his Reply in Support of his Motion to Compel Arbitration and during the hearing, Defendant Lopez briefly argued that the Separation Agreement's integration clause subsumes the PIIA such that no claims remain regarding the PIIA. (*See* Lopez Reply at

10; ECF No. 42.)  Because this was a new issue that was not fully briefed, the Court gave the Parties notice of its tentative opinion as it relates to the Motion to Compel Arbitration. (ECF No. 43.)  The Court noted that the Separation Agreement reminds Defendant Lopez of his continuing obligations to return all of Plaintiff's property and includes an integration clause stating that the Separation Agreement "constitutes the complete, final[,] and exclusive embodiment of the entire agreement between [Plaintiff] and [Defendant Lopez] with regard to the subject matter hereof." (*Id*. (quoting Ex. D at 59–60).)  The Court also highlighted that a plain reading of the MAA appears to suggest that Plaintiff and Defendant Lopez agreed to arbitrate any and all disputes arising from or relating to Lopez's employment or termination including claims for breach of contract. (*Id*. (first citing ECF No. 38-1 at 6; and then citing ECF No. 38-2 at 9).)  The Court requested responses from the Parties on these issues, providing the Parties the opportunity to clarify their positions regarding the PIIA and arbitration. (*Id*. at 2–3.)

In its response, Plaintiff reiterates its argument that this dispute involving misappropriation of trade secrets is excluded from the MAA's scope, (ECF No. 44 at 3–5), and explains that the Separation Agreement does not supersede the PIIA, (*id*. at 5–8). Plaintiff cites various cases finding that a general integration clause is insufficient to show the parties' intent to substitute a new contract for an old one. (*Id*. at 6–8.)  Defendant Lopez, on the other hand, reiterates his argument that the Court's prior Order voided the anti-competitive provisions of the PIIA and then explains that the integration clause of the Separation Agreement indicates that the Separation Agreement "preempt[s] the field and other earlier agreement[s] that might cover the same subject matter." (ECF No. 45 at 3–4.)  Defendant Lopez further contends that "any agreement concerning any subject matter set forth in the Separation Agreement is merged into the Separation Agreement and Plaintiff must look to the Separation Agreement, and the Separation Agreement alone, for relief." (*Id*. at 4 (citing *Ingram Micro Inc. v. Signeo Int'l, Ltd.*, No. SACV 13-1934-DOC (ANx), 2014 WL 3721197 (C.D. Cal. July 22, 2014)).)

/ / /

As the Court already stated, the breach of contract claim is distinct from Plaintiff's other claims regarding misappropriation of trade secrets and is within the MAA's scope. *See supra* pp. 21–22.  But Plaintiff is correct that the general integration clause of the Separation Agreement is insufficient to show that the Parties intended for the Separation Agreement to replace the PIIA.  Courts have found that general integration clauses do not supersede the rights and obligations found in prior agreements—instead, an integration clause must be specific and clearly show such intent.  *See Olympic Fin. Co. v. Thyret*, 337 F.2d 62, 65 (9th Cir. 1964) (evidence of parties' intent to substitute a new obligation in place of an existing obligation must be clear and convincing); *Multimedia Patent Tr. v. DirecTV Inc.*, No. 09-CV-00278-H (CAB), 2011 WL 3610098, at *3 (S.D. Cal. Aug. 16, 2011) ("'[A]n intent to extinguish earlier contractual obligations cannot be inferred from a standard merger clause simply because the parties to the later agreement also entered an earlier contract on a topic.'  A boilerplate merger clause 'does not evidence a "clear expression" of intent to extinguish a separate and distinct written contract.'" (citation omitted)).  Standard integration clauses "can be understood to merely signal that the [new agreement] was completely integrated for the purposes of evaluating the parties' intent for that agreement."  *Jocson v. Diamond Resorts Int'l Club, Inc.*, No. 2:18-cv-10604-AB (JEMx), 2019 WL 10854465, at *5 (C.D. Cal. Mar. 28, 2019) (citation omitted); *see Malveda v. Experian Info. Sols., Inc.*, No. 22-cv-07244-RS, 2022 WL 94921, at *3 (N.D. Cal. Jan. 10, 2022) (finding that the integration clause "is better read as a clause excluding the use of extrinsic evidence in interpreting the contract").  Likewise, here, the Court finds the integration clause Defendant Lopez relies on, (*see* Ex. D at 60), to be a general integration clause that is better read as a clause excluding the use of extrinsic evidence in interpreting the Parties' agreement and evincing their intent for that agreement, not a clause that subsumes a prior agreement.

The case Defendant Lopez relies on does not change this conclusion.  In *Ingram Micro Inc.*, the court found that prior agreements were superseded by a more recent agreement that included the following merger provision: "The Parties hereby shall

mutually forever release, acquit and discharge . . . all claims of any kind and character arising under any and all circumstances existing on or before the execution of this Agreement, which either Party now has, owns, or holds, or at any time heretofore or hereafter ever had, owned, or held, arising out of, connected with, or incidental to and any other claims arising out of or related to the Parties' business transactions and the 2011 [and 2012 Agreements]." *Ingram Micro Inc.*, 2014 WL 3721197, at *1 & n.2, 3. Unlike the merger clause in *Ingram Micro Inc.* that clearly shows the parties' intent to release claims relating to prior agreements, the general integration clause in the Separation Agreement here demonstrates no such intent. As a result, the Separation Agreement does not subsume the PIIA and Plaintiff's claim for breach of the PIIA survives as a standalone claim.

In his response to the Court's tentative opinion, Defendant Lopez states, "Arbitration should be compelled but *only* for the Separation Agreement as the PIIA has no provisions left under which a cognizable claim can be asserted in a litigation or arbitration." (*Id.* at 7 (emphasis added).) Defendant Lopez, however, did not state his position regarding whether Plaintiff's claim for breach of the PIIA should be arbitrated if the Court determines that the Separation Agreement does not subsume the PIIA. Defendant has not requested that the Court compel arbitration of Plaintiff's breach of contract claim as it relates to the PIIA. The Court therefore only orders arbitration of Plaintiff's breach of contract claim *as it relates to the Separation Agreement*. *See Wren v. Sletten Constr. Co.*, 654 F.2d 529, 537 (9th Cir. 1981) (noting that courts do not enforce private agreements that they are not requested to enforce); *Beauperthuy v. 24 Hour Fitness USA, Inc.*, No. 06-0715 SC, 2006 WL 3422198, at *4 (N.D. Cal. Nov. 28, 2006) ("[T]he Court cannot, *sua sponte*, order parties to arbitration.").

## II.   Defendants Vector and Lopez's Request for Attorneys' Fees

Defendant Lopez states, "[i]f the Court finds that only the overly broad provisions of the PIIA are void and unenforceable (as Plaintiff suggests), then the attorneys' fees provision in Section 18 [of the PIIA] is still effective and Defendants are entitled to attorneys' fees as the prevailing party." (Lopez Mem. at 8.) This request however is

premature:  Lopez is not yet the prevailing party given the Court's finding that Plaintiff's breach of contract claim relating to the PIIA is not subject to dismissal at this time.  *See supra* p. 18.

## III.   Defendant Naujok's Motion to Dismiss

Plaintiff alleges the following causes of action against Naujok: (1) breach of contract; (2) violations of CUTSA and the DTSA; (3) unjust enrichment; and (4) unfair business practices.  (FAC ¶¶ 77–136.)  Naujok moves to dismiss each of these claims pursuant to Federal Rule of Civil Procedure 12(b)(6).[15]  (Naujok Mot. at 2.)

### A.     Breach of Contract Claim

To state a breach of contract claim under California law, a plaintiff must allege "(1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff."  *Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011).  "The purpose of the law of contracts is to protect the reasonable expectations of the parties."  *Coles v. Glaser*, 2 Cal. App. 5th 384, 392 (Ct. App. 2016) (citation omitted).  A plaintiff is not required to "attach the contract or recite the contract's terms verbatim," but it "must identify with specificity the contractual obligations allegedly breached by the defendant."  *Kaar v. Wells Fargo Bank, N.A.*, No. C 16-01290 WHA, 2016 WL 3068396, at *1 (N.D. Cal. June 1, 2016) (citation omitted).

Plaintiff's breach of contract claim against Naujok alleges that Naujok failed to surrender Genasys' materials after his employment was terminated in violation of the PIIA he signed.  (FAC ¶¶ 77–85.)  Naujok contends this claim fails as "fatally uncertain and void."  (Naujok Mem. at 12 (original formatting omitted).)  Specifically, Naujok argues that the PIIA only applies to employees, and under Plaintiff's own facts, Naujok's employment ended in October 2018 when Naujok became a consultant for Plaintiff and

---

[15]     As previously noted, *see supra* p. 9 n.5, Defendants Lopez and Vector have "joined" Defendant Naujok's Motion to Dismiss as it relates to the DTSA, CUTSA, unjust enrichment, and unfair business practices claims.  (*See* ECF No. 32.)  The Court's Order here regarding each of those claims thus applies to all Defendants to the extent that the arguments are equally applicable.

still had access to the documents given his consultant role.  (*Id*. at 13.)  Naujok further argues that any reference by Plaintiff to a contractual obligation of a non-employee not within the PIIA, and without any details regarding such purported agreement, does not suffice to allege a valid breach of contract claim.  (*Id*.)  Naujok also contends that Plaintiff has not alleged facts sufficient to support its allegation that it performed its end of the bargain of the PIIA contract.  (*Id*. at 14.)  Finally, Naujok, like Lopez, argues that the PIIA—as a whole—is void and unenforceable anyway.  (*Id*. at 14–16.)

Plaintiff counters that its breach of contract claim is clear and straightforward:  its First Amended Complaint "alleges that Naujok breached [the PIIA] by failing to return Genasys' property at the conclusion of his employment in late 2018."  (Opp'n Naujok Mot. at 13.)  Plaintiff explains that "Naujok was given materials *prior* to the termination of his employment in 2018 that were never surrendered."[16]  (*Id*. at 13–14.)  Plaintiff further explains that, as alleged in the First Amended Complaint, it performed its obligations under the PIIA by providing Naujok employment.  (*Id*. at 17–18.)  Finally, like Lopez's PIIA, Plaintiff contends Naujok's PIIA is not void and unenforceable.  (*Id*. 14–17.)

For the same reasons discussed above, *see supra* pp. 14–15, the Court finds Naujok's PIIA is not void and unenforceable in its entirety.[17]  The only question the Court must decide then is whether Plaintiff's First Amended Complaint has sufficiently alleged the elements of a breach of contract.  Naujok appears to argue that the first three elements of a breach of contract claim are not met.

As to the first element, Plaintiff has demonstrated that Naujok signed a written agreement (the PIIA) in which he promised to return Genasys' materials at the conclusion of his employment.  (FAC ¶¶ 17, 78; *see* Ex. B ¶ 10.)  Plaintiff attached the PIIA to its First

---

[16]    The Court notes that the Army Presentation did not occur until May 2019, which, according to Plaintiff's allegations, is after Naujok was no longer a Genasys' employee.  (*See* FAC ¶¶ 15, 18–19, 22.)

[17]    The PIIA Naujok signed is identical to the PIIA Lopez signed, including the severability clause. (*Compare* Ex. A *with* Ex. B.)

Amended Complaint and the provision at issue is quoted verbatim in the First Amended Complaint.  (*See* Ex. B ¶ 10; FAC ¶ 17.)  Plaintiff has therefore sufficiently alleged the existence of a contract.

As to Plaintiff's performance of its end of the bargain, Plaintiff alleges that "Genasys has fully performed all material obligations under the Naujok PIIA, including, but not necessarily limited to, providing Naujok employment."  (FAC ¶ 79.)  None of Naujok's factual allegations controvert this general statement.  (*See* Naujok Mem. at 14.)  Plaintiff's allegation that it performed its obligations under the PIIA is sufficient at this stage of the proceedings.  *See* Fed. R. Civ. P. 9(c) ("In pleading conditions precedent, it suffices to allege generally that all conditions precedent have occurred or been performed."); *Kiernan v. Zurich Cos.*, 150 F.3d 1120, 1124 (9th Cir. 1998) (holding that a plaintiff's general statement is an adequate averment of performance of conditions precedent); *PerkinElmer Health Scis., Inc. v. Mahnaz Salem*, No. CV 21-1619-DMG (KSx), 2021 WL 2548684, at *3 (C.D. Cal. Apr. 9, 2021) (finding the plaintiff was likely to succeed on the merits of its breach of contract claim and noting the plaintiff had "fulfilled its end of the bargain by hiring and compensating" the defendant); *see also TreeFrog Devs., Inc. v. Seidio, Inc.*, No. 13cv0158-IEG (KSC), 2013 WL 4028096, at *3–4 (S.D. Cal. Aug. 6, 2013).

Finally, as to Defendant Naujok's breach, Plaintiff alleges that "[d]uring Naujok's Employment Period, he accumulated substantial files containing Genasys sales materials and customer information, but rather than surrender these files at the termination of his employment as required by the PIIA, Naujok retained some or all of these materials throughout the Representative Period and beyond."  (FAC ¶ 80.)  Plaintiff's First Amended Complaint also states, "Whether Naujok's employment ended at the end of the Employment Period, or as he now alleges, continued until May 2021, Naujok failed to comply with the requirement that he surrender Genasys' materials to Genasys and Naujok thereby breached the Naujok PIIA."  (*Id.* ¶ 81.)  "For instance, Naujok personally retained the Channel Report, information mined therefrom, or Genasys' accumulation of customer contact information rendered in some other fashion, as well as other property of Genasys,

such as electronic files containing customer sales information and presentation materials, both after October 2018 and after May 2021." (*Id*.) Plaintiff also explains that "[a]fter terminating his employment initially in October 2018, Naujok sent Genasys a letter, dated May 7, 2021, in which he terminated the Representative Period and he informed Genasys that all Genasys material will be returned." (*Id*. ¶ 45; *see* Ex. F.) Plaintiff contends that "[w]hether Naujok's employment ended at the end of the Employment Period (i.e., October 2018), or, as he now alleges, continued through the Representative Period (i.e., May 2021), Naujok failed to comply with the requirement of the Naujok PIIA that he surrender Genasys' materials to Genasys at the conclusion of his employment." (FAC ¶ 46.)

Defendant Naujok's argument that he continued to have access to Genasys' confidential information after his employment ended and his consultative services began, and that Genasys took no steps to protect any of its information during the "Representative Period," is well taken. (Naujok Mem. at 13–14.) But at this stage of the proceedings, the Court declines to resolve the factual dispute regarding what the Parties' expectations were during the Representative Period and whether Naujok's consulting services negated the requirement that Naujok surrender Genasys' materials in October 2018. Instead, as alleged, and drawing all reasonable inferences in its favor, Plaintiff has sufficiently alleged Naujok breached the PIIA by not returning Genasys' materials when his employment was terminated in October 2018. The Court therefore **DENIES** Naujok's Motion to Dismiss Plaintiff's breach of contract claim.

### B. Claims Pursuant to the California Uniform Trade Secrets Act and the Defend Trade Secrets Act

The DTSA and CUTSA share the same pleading standards: Plaintiff "must allege (1) that it is the owner of a trade secret; (2) that the defendant misappropriated the trade secret; and (3) that it was damaged by the defendant's actions." *Alta Devices, Inc. v. LG Elecs., Inc.*, 343 F. Supp. 3d 868, 880–81 (N.D. Cal. 2018); *see also InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657 (9th Cir. 2020) ("Courts have analyzed these claims together because the elements are substantially similar."). The alleged trade secrets

must be specifically identified—Plaintiff need not spell out all the details, but it must "describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special persons who are skilled in the trade, and to permit the defendant to ascertain at least the boundaries within which the secret lies." *Vendavo, Inc. v. Price f(x) AG*, No. 17-cv-06930-RS, 2018 WL 1456697, at *4 (N.D. Cal. Mar. 23, 2018) (citation omitted).

The definition of a "trade secret" is also extremely similar under the DTSA and CUTSA. *See Workplace Techs. Rsch., Inc. v. Project Mgmt. Inst., Inc.*, No. 18cv1927 JM (MSB), 2021 WL 4895977, at *20 (S.D. Cal. Oct. 20, 2021). Under the DTSA, a "trade secret" is:

> [F]inancial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes . . . if—(A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1839(3). Under CUTSA, a "trade secret" is:

> [I]nformation, including a formula, pattern, compilation, program, device, method, technique, or process, that: (1) [d]erives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Cal. Civ. Code § 3426.1(d). Under either statute, "[t]herefore, the definition of trade secret consists of three elements: (1) information, (2) that is valuable because it is unknown to others, and (3) that the owner has attempted to keep secret." *InteliClear, LLC*, 978 F.3d at 657. Insight, knowledge, and know-how "acquired by an insider to a particular trade does not, in and of itself, constitute trade secrets." *Calendar Rsch. LLC v. StubHub, Inc.*, No.

2:17-CV-04062-SVW-SS, 2017 WL 10378336, at *2 (C.D. Cal. Aug. 16, 2017) (quoting *Agency Solutions.com, LLC v. TriZetto Grp., Inc.*, 819 F. Supp. 2d 1001, 1019 (E.D. Cal. 2011)).

"To have independent economic value, a trade secret must be 'sufficiently valuable and secret to afford an actual or potential economic advantage over others.'" *Id.* at *3 (quoting *Yield Dynamics, Inc. v. TEA Sys. Corp.*, 154 Cal. App. 4th 547, 564 (Ct. App. 2007)). "[C]ircumstantial evidence of the resources invested in producing the information, the precautions taken to protect its secrecy, and the willingness of others to pay for its access" all can sufficiently meet the low standard to show trade secrets derive economic value. *Id.* at *3–4 (citation omitted). "Moreover, 'information can have independent economic value even if there is no actual product on the market utilizing the information.'" *Id.* at *3 (citation omitted).

Furthermore, under both the DTSA and CUTSA, misappropriation means either "(1) the '[a]cquisition of a trade secret by another person who knows or has reason to know that the trade secret was acquired by improper means;' or (2) the '[d]isclosure or use of a trade secret of another without express or implied consent.'" *Alta Devices, Inc.*, 343 F. Supp. 3d at 877 (first quoting 18 U.S.C. § 1839(5); and then quoting Cal. Civ. Code § 3426.1(b)).

In its prior Order, the Court found that Plaintiff had not sufficiently alleged a trade secret because it only provided conclusory allegations relating to large sources of information that could qualify as trade secrets, rather than providing the Court with a roadmap to determine what information might be a trade secret and what might not be. (ECF No. 21 at 17–18.) The Court also noted that Plaintiff "adequately describe[d] how Defendants misappropriated the alleged trade secrets through their acquisition during employment and use at Vector Acoustics following termination of their employment." (*Id.* at 18 n.9.)

To fix this deficiency, in its First Amended Complaint, Plaintiff narrows its DTSA and CUTSA claims and states that the Channel Report constitutes a trade secret—as defined by those statutes—that Defendants misappropriated. (FAC ¶¶ 87, 98.) Plaintiff

added several pages of factual information about the Channel Report explaining that the Channel Report is a Microsoft Excel document that contains the following information about Genasys customers that serve as resellers or prospective sellers of Genasys' products: "information about each customer's geographic scope, information about the product preferences and product needs of these customers, and detailed contact information for these customers, such as the representative who is the primary contact for that customer and how best to reach that person." (*Id.* ¶¶ 31, 34, 36.) Plaintiff further notes that the Channel Report specifically "identifies the various resellers and potential resellers by region and contains certain personal email addresses, phone numbers, and mailing addresses; nonpublic information about Genasys' contracts with the resellers, such as the contract execution and expiration dates; . . . and certain unpublished and private notes or comments related to Genasys' business with particular companies, together with Genasys' plans with respect to future dealings with certain companies." (*Id.* ¶ 35.) Plaintiff explains that this report is "extremely confidential, . . . is not publicly available," and "represents countless hours curating internal business development information." (*Id.* ¶¶ 34, 37.)

Plaintiff also alleges that "Genasys carefully guards against the disclosure of the Channel Report and the information contained therein through, for instance, requiring that as part of the PIIA, employees hold in the strictest confidence, and not use, publish, or disclose without written authorization of the Board of Directors of the Company, 'any past, present, or future . . . sales and customer information [and] customer and prospect lists.'" (*Id.* ¶ 41.) "The PIIA specifically notes that this obligation exists 'both during and after' the termination of employment." (*Id.*)

In addition to these added factual allegations, Plaintiff alleges the following under both the DTSA and CUTSA:

(1) "The Channel Report constitutes a trade secret [under the DTSA and CUTSA] in that it derives independent economic value, actual or potential, from not being generally known to competitors or the public or to other persons who can obtain economic value from its disclosure or use; and, as set forth above, is and has been the subject of efforts by Genasys that are reasonable under the circumstances to

maintain its secrecy, including, but not limited to, requiring all employees to sign a PIIA and requiring manufacturing representatives, such as AugenTek, LLC to promptly return to Genasys all documents, materials, and all tangible property supplied by Genasys at the time their representation is terminated." (FAC ¶ 87; *see id.* ¶¶ 101–02.)

(2) "In particular, the Channel Report represents countless hours of careful cultivation and recording of reseller relationships and insider knowledge of the decision-makers within such resellers, together with such decision-makers' personal and generally non-public contact information. Moreover, the Channel Report includes the specifics as to the term periods of Genasys' various reseller contracts, product preferences, product needs, and geographic scope. A competitor (such as Vector Acoustics) who has unlawfully gained access to Genasys' Channel Report will know who to contact, how to contact him or her, and when to contact him or her to market a competing product . . . . The Channel Report is therefore work product that Genasys lawfully owns and provides Genasys an advantage if maintained in secret." (*Id.* ¶¶ 88, 99.)

(3) "Defendants misappropriated Genasys' trade secrets by, for instance, improperly retaining and using the Channel Report in the marketing and sale of [Vector Acoustic Products]." (*Id.* ¶¶ 89, 104.)

(4) "Genasys is aware of at least two regional contacts [in Japan and Canada] on the Channel Report that have received personalized messages from Defendants to email addresses that are not publicly available. Accordingly, Defendants used the reseller contact information from the Channel Report that they had retained from Genasys to contact these customers that serve as regional resellers, and this constitutes misappropriation of trade secrets prohibited under [the DTSA and CUTSA]." (*Id.* ¶¶ 90, 105; *see also id.* ¶¶ 56–57.)

(5) "Defendants knew or should have known that the Channel Report constitutes a valuable trade secret of Genasys and that Defendants were under an obligation at law to maintain the confidentiality of such information and not to use it without Genasys' knowledge and consent." (*Id.* ¶¶ 91, 103.)

Despite these added allegations, Defendant Naujok contends that the First Amended Complaint fails to allege a trade secret with sufficient particularity because Plaintiff's description of the trade secret "amount[s] to nothing more than 'broad categorial terms.'" (Naujok Mem. at 18; *see* Reply at 5.) Naujok also argues that Plaintiff's First Amended Complaint fails to sufficiently allege misappropriation because it only provides conclusory

and vague allegations and does not show that Naujok used or relied on the alleged trade secrets.  (Naujok Mem. at 19–20; Reply at 5–6.)  More specifically, Naujok contends that Plaintiff's allegation that Naujok utilized the Channel Report to reach out to two regional contacts fails to state a claim because "merely informing customers of a change of employment or reaching out to former customers of a former employer, such as Genasys, does not constitute misappropriation."  (Naujok Mem. at 20–21; *see id*. at 21 ("[T]here is no evidence that Defendants used or relied upon the Channel Report in contacting the purported Genasys customers.")

Plaintiff counters that its First Amended Complaint carefully and sufficiently describes the alleged trade secret information in its explanation of the Channel Report.  (Opp'n Naujok Mot. at 19–20.)  Plaintiff also argues that the First Amended Complaint sufficiently alleges that Naujok acquired the Channel Report by improper means:  Naujok failed to surrender the Channel Report at the conclusion of his employment as required.  (*Id*. at 21.)  And as an additional basis for misappropriation, the First Amended Complaint alleges that Naujok *used* the Channel Report to contact customers listed in that report.  (*Id*.)

Plaintiff is correct.  Despite Naujok's argument that Plaintiff failed to describe the alleged trade secret with particularity, Plaintiff provided almost three pages of detail about the Channel Report and does not categorize the Channel Report in broad terms.  (*See* FAC ¶¶ 31–41, 56–57.)  Courts have found customer/client documents discussed in sufficient detail to constitute trade secrets.  *See Navigation Holdings, LLC v. Molavi*, 445 F. Supp. 3d 69, 77 (N.D. Cal 2020) ("[T]he Court finds that Plaintiffs' description of their client information sufficiently alleges a trade secret."); *Spice Jazz LLC v. Youngevity Int'l, Inc.*, No. 19-cv-0583-BAS-DEB, 2020 WL 6484640, at *4 (S.D. Cal. Nov. 4, 2020) ("Courts have regarded customer information that requires time and effort to gather as protected trade secrets, unlike customer information that anyone can easily access."); *Pyro Spectaculars N., Inc. v. Souza*, 861 F. Supp. 2d 1079, 1088–89 (E.D. Cal. 2012) (finding comprehensive compilation of customer, operator, and vendor information constituted / / /

protected trade secrets).  The Court thus finds that Plaintiff has sufficiently alleged a trade secret.

As for misappropriation, the Court finds no reason to revisit its prior conclusion that Plaintiff "adequately describe[d] how Defendants misappropriated the alleged trade secrets through their acquisition during employment and use at Vector Acoustics following termination of their employment."  (ECF No. 21 at 18 n.9.)  To be sure, Plaintiff alleges that Naujok retained the Channel Report at the conclusion of his employment, which violated the PIIA, and then he used the Channel Report to reach out to at least two contacts on the Channel Report in Japan and Canada.  (FAC ¶¶ 56–57, 90, 105.)  Naujok seeks to hold Plaintiff to a higher standard than that required to survive a motion to dismiss—he contends there is "no *evidence* that Defendants used or relied upon the Channel Report in contacting the purported Genasys customers."[18]  (Naujok Mem. at 21.)  But Plaintiff does not need to present evidence at the motion to dismiss stage; Plaintiff only needs to present sufficient allegations that state a claim.  And here, drawing all reasonable inferences in Plaintiff's favor, the Court finds Plaintiff has sufficiently alleged misappropriation.  The Court thus **DENIES** Naujok's Motion to Dismiss Plaintiff's trade secret misappropriation claims pursuant to CUTSA and the DTSA.

### C.   *Unjust Enrichment*

Plaintiff seeks to bring an unjust enrichment claim "in the alternative to" its breach of contract claims against Lopez and Naujok.  (FAC ¶ 114.)  Plaintiff alleges that "Defendants have been wrongfully enriched through their use of the Army Presentation Materials and other non-trade secret materials that they wrongfully retained after the conclusion of their employment in that they have used such materials in the development,

---

[18]     Naujok's argument that informing customers of a change of employment does not constitute misappropriation, (*see* Naujok Mem. at 20–21 (citing *Am. Credit Indem. Co. v. Sacks*, 213 Cal App. 3d 622, 635 (Ct. App. 1989))), is at most, a factual dispute not appropriate for resolution at the motion to dismiss stage because the facts surrounding why Naujok reached out to contacts on the Channel Report are not established.

manufacturing, marketing[,] and/or sale of [Vector Products]." (*Id.* ¶ 115.) Defendant Naujok moves to dismiss this claim arguing it is preempted by CUTSA. (Naujok Mem. at 21–24.)

"CUTSA provides the exclusive civil remedy for conduct falling within its terms, so as to supersede other civil remedies 'based upon misappropriation of a trade secret.'" *Silvaco Data Sys. v. Intel Corp.*, 184 Cal. App. 4th 210, 236 (Ct. App. 2010) (quoting Cal. Civ. Code § 3426.7 (a), (b)), *disapproved on other grounds by Kwikset Corp. v. Superior Ct.*, 52 Cal. 4th 310, 337 (2011). Where state-law claims are based on the same nucleus of facts as trade secret misappropriation, they are preempted by CUTSA. *See K.C. Multimedia, Inc. v. Bank of Am. Tech. & Operations, Inc.*, 171 Cal. App. 4th 939, 962 (Ct. App. 2009); *see, e.g.*, *SunPower Corp. v. SolarCity Corp.*, No. 12–cv–00694–LHK, 2012 WL 6160472, at *13 (N.D. Cal. Dec. 11, 2012) (dismissing common law claims as preempted by CUTSA where "while stated in various ways, each [claim] alleges in essence that [d]efendants [misappropriated] . . . proprietary information"). CUTSA however does not preempt "contractual remedies" and civil remedies "that are not based upon misappropriation of a trade secret." *Silvaco Data Sys.*, 184 Cal. App. 4th at 233; *see also Loop AI Labs Inc. v. Gatti*, No. 15-CV-00798-HSG, 2015 WL 5158461, at *2 (N.D. Cal. Sept. 2, 2015).

"Although the California Supreme Court has not expressly articulated the scope of CUTSA's supersession of claims arising from the alleged misappropriation of non-trade secret information, 'the majority of district courts that have considered *Silvaco* have held that CUTSA supersedes claims based on the misappropriation of information that does not satisfy the definition of trade secret under CUTSA.'" *Loop AI Labs Inc.*, 2015 WL 5158461, at *2 (citation omitted); *see SunPower Corp.*, 2012 WL 6160472, at *6 (collecting cases); *see also Heller v. Cepia, L.L.C.*, No. C 11-01146 JSW, 2012 WL 13572, at *7 (N.D. Cal. Jan. 4, 2012) (holding that common law claims premised on "the wrongful taking and use of confidential business and proprietary information, regardless of whether such information constitutes trade secrets, are superseded by the CUTSA"); *Mattel, Inc. v.*

*MGA Ent., Inc.*, 782 F. Supp. 2d 911, 987 (C.D. Cal. 2011) ("[T]he Court concludes that [C]UTSA supersedes claims based on the misappropriation of confidential information, whether or not that information meets the statutory definition of a trade secret.").

More specifically, "*Silvaco* exempts claims based on non-trade secret information from CUTSA supersession only if said claims (1) allege facts showing that the plaintiff's property right in the information at issue stems from some provision of positive law on grounds qualitatively different from grounds upon which trade secrets are considered property, or (2) allege wrongdoing materially distinct from the wrongdoing alleged in a CUTSA claim." *Swarmify, Inc. v. Cloudflare*, *Inc.*, No. C 17-06957 WHA, 2018 WL 1609379, at *2 (N.D. Cal. Apr. 3, 2018) (citation omitted); *see SunPower Corp.*, 2012 WL 6160472, at *5 ("In order for the taking of information to constitute wrongdoing, the information must be property.  Information is not property unless some 'positive law' makes it so.").  And "[i]f the basis of the alleged property right is in essence that the information . . . is 'not . . . generally known to the public,' then the claim is sufficiently close to a trade secret claim that it should be superseded notwithstanding the fact that the information fails to meet the definition of a trade secret.  *SunPower Corp.*, 2012 WL 6160472, at *5 (citation omitted).  To permit otherwise would allow plaintiffs to avoid the preclusive effect of CUTSA (and thereby plead potentially more favorable common-law claims) by simply failing to allege one of the elements necessary for information to qualify as a trade secret." *Id.*  "At the pleading stage, the supersession analysis asks whether, stripped of facts supporting trade secret misappropriation, the remaining factual allegations can be reassembled to independently support other claims for relief." *Swarmify, Inc.*, 2018 WL 1609379, at *2 (citing *Qiang Wang v. Palo Alto Networks, Inc.*, No. C 12–05579 WHA, 2013 WL 415615, at *4 (N.D. Cal. Jan. 31, 2013)).

Here, Plaintiff argues that its alternative claim for unjust enrichment does not involve misappropriating *information*, and instead the claim for relief is focused on actual *materials*: the "Army Presentation Materials and the other non-trade secret materials." (Opp'n Naujok Mot. at 23; FAC ¶ 115.)  Plaintiff contends its unjust enrichment claim

focuses on the manner in which Naujok used these materials to "give himself a leg up in selling Vector's products." (Opp'n Naujok Mot. at 23–24.) Plaintiff also explains that "while Genasys' trade secret claim arose from Naujok's improper retention and use of the Channel Report, the unjust enrichment claim arose from Naujok's retention and use of other materials, such as the Army Presentation Materials."[19] (*Id.* at 25.)

Plaintiff's own description of its unjust enrichment claim highlights that at least part of that claim, as alleged, is preempted by CUTSA. To the extent Plaintiff is relying on the same facts as its CUTSA claim but calling the Army Presentation Materials "non-trade secret materials," in an attempt to evade CUTSA's preemption, its unjust enrichment claim must be dismissed.[20] *See SunPower Corp.*, 2012 WL 6160472, at *13 (dismissing common law claims as preempted by CUTSA where "while stated in various ways, each [claim] alleges in essence that [d]efendants [misappropriated] . . . proprietary information"); *Heller*, 2012 WL 13572, at *7 (holding that common law claims premised on "the wrongful taking and use of confidential business and proprietary information, regardless of whether such information constitutes trade secrets, are superseded by the CUTSA"). Plaintiff has not alleged that its property right in the "non-trade secret materials" "stems from some provision of positive law on grounds qualitatively different from grounds upon which trade secrets are considered property" or that the alleged wrongdoing is "materially distinct from the wrongdoing alleged in a CUTSA claim." *Swarmify, Inc.*, 2018 WL 1609379, at *2; *See Heller*, 2012 WL 13572, at *7 ("[Plaintiff] has not identified any law that confers property rights on his non-trade secret confidential information."); *SunPower Corp.*, 2012 WL 6160472, at *5 ("In order for the taking of information to constitute wrongdoing, the

---

[19] Plaintiff's First Amended Complaint highlights that Plaintiff believes the Army Presentation Materials to be confidential, proprietary information. (*See* FAC ¶ 26 ("The Army Presentation Materials were carefully guarded by Genasys and the sharing of the Army Presentation Materials was extremely limited within Genasys.").)

[20] In other words, Plaintiff's unjust enrichment claim, aside from any quasi-contract unjust enrichment claim, must be dismissed.

42

information must be property.  Information is not property unless some 'positive law' makes it so.").

To the extent, however, that Plaintiff's unjust enrichment claim is truly an alternative pleading to its breach of contract claims, (*see* FAC ¶ 114), it survives CUTSA preemption and Defendant Naujok's Motion to Dismiss.  While "a quasi-contractual claim based on unjust enrichment cannot lie where there exists between the parties a valid, express contract covering the same subject matter," "at the pleading stage, a party may plead alternative or even inconsistent theories."  *Kyocera Corp. v. Hecmma Inc.*, No. 04-cv-1347 H (CAB), 2006 WL 8455447, at *2–3 (S.D. Cal. Mar. 17, 2006).  Defendants have argued the PIIAs in this case are void and unenforceable.  (*See* Lopez Mem. at 4–6; Naujok Mem. at 14–16.)  The Court has ruled that some of the contractual provisions the Parties have disputed and on which they have presented argument are void and others are enforceable.  Based on the Court's rulings thus far finding the PIIAs are not entirely void and unenforceable, the Court is skeptical that Plaintiff's alternative unjust enrichment claim will remain a viable claim, but at the pleading stage, it is too early to make that determination.  *See Kyocera Corp.*, 2006 WL 8455447, at * 3.  That determination is better suited for summary judgment, *see id.*, especially because Defendant Naujok's Motion focused on CUTSA preemption rather than whether Plaintiff's unjust enrichment claim could serve as an alternative to Plaintiff's breach of contract claims.

The Court therefore **GRANTS IN PART AND DENIES IN PART** Naujok's Motion to Dismiss Plaintiff's unjust enrichment claim and **PARTIALLY DISMISSES** that claim against *all* Defendants since Defendants Lopez and Vector joined in that motion.  *See Copart, Inc. v. Sparta Consulting, Inc.*, 277 F. Supp. 3d 1127, 1160 (E.D. Cal. 2017) (dismissing unjust enrichment claim that partially relied on same facts as CUTSA claim and finding other portion of claim survived).  This ruling in no way hinders Plaintiff's ability to seek damages measured by unjust enrichment stemming from its trade secret misappropriation claims.  *See, e.g.*, *Swarmify, Inc.*, 2018 WL 1609379, at *4.

/ / /

### D.   Unfair Business Practices Pursuant to California Business and Professions Code section 17200

"[U]nfair competition shall mean and include any unlawful, unfair[,] or fraudulent business act or practice and unfair, deceptive, untrue[,] or misleading advertising and any act prohibited by Chapter 1."  Cal. Bus. & Prof. Code § 17200 ("Section 17200").  A plaintiff can establish a prohibited business act or practice under any of the three listed categories.  *See Missud v. Oakland Coliseum Joint Venture*, No. 12-02967 JCS, 2013 WL 3286193, at *19 (N.D. Cal. June 27, 2013) (categorizing the three types of prohibited business acts or practices as (1) unlawful, (2) unfair, or (3) fraudulent).  "[T]o establish standing under the [Unfair Competition Law] a plaintiff must '(1) establish a loss or deprivation of money sufficient to qualify as injury in fact, i.e., *economic injury*[;] and (2) show that the economic injury was the result of, i.e., *caused by*, the unfair business practice . . . that is the gravamen of the claim.'"  *Id*. (quoting *Lawther v. One West Bank, FSB*, 2012 WL 298110, at *23 (N.D. Cal. Feb. 1, 2012)).

Here, Plaintiff alleges that Defendants engaged in unfair and unlawful business tactics including deceptive, untrue, and/or misleading advertising by:  (1) "inserting the Army Presentation Materials into the Vector Acoustics Presentation Materials" presented to the Taiwanese Coast Guard thereby implying that Vector was the party servicing the United States Army, (FAC ¶¶ 119, 121, 124, 127); (2) "claiming that the patents on . . . Genasys Products have expired and by misleadingly or falsely representing [in product comparisons] the input power of the . . . Genasys Products" in an attempt to convince third parties to purchase Vector products instead of Genasys products, (*id.* ¶¶ 122, 126, 128–29, 133); and (3) "improperly retaining and using the Channel Report and improperly mining information from the Channel Report," (*id.* ¶ 130).

Defendant Naujok moves to dismiss Plaintiff's unfair business practices claim for two reasons:  (1) like the unjust enrichment claim, it is preempted by CUTSA; and (2) the

/ / /

/ / /

44

allegations within the claim "relate to entities and individuals other than Naujok."[21] (Naujok Mem. at 24–27.)  Naujok contends that the First Amended Complaint "specifically alleges that Gregory Almeida (on behalf of Vector) (not Naujok) is the one who made the . . . purported patent misrepresentation . . . and distributed the 'Product Comparisons.'" (*Id.* at 27 (emphasis omitted).)

Plaintiff counters that there is disagreement among Ninth Circuit district courts as to whether CUTSA supersedes Section 17200, and some California authority holds that CUTSA does not preempt claims under Section 17200.  (Opp'n Naujok Mot. at 27–29.) Plaintiff also argues that even though Gregory Almeida "was the individual caught disseminating" the "incorrect, untrue, and false statements about" Genasys' products, Naujok helped prepare the product comparisons that made those statements and is still at fault.  (*Id.* at 26–27.)

While it is true that there is some disagreement among Ninth Circuit district courts as to whether CUTSA supersedes Section 17200, many courts that have considered *Silvaco*, *see supra* pp. 40–41, have found that CUTSA supersedes other civil remedies based upon misappropriation of a trade secret, including Section 17200 claims.[22]  *See Loop*

---

[21]     In one sentence in his Reply, Naujok states without further explanation that "the identified statutes [in Plaintiff's unfair business practices claim] appl[y] within the consumer context, which is inapplicable under the facts alleged within the FAC."  (Naujok Reply at 8.)  And in another sentence in his Reply, Naujok states "misrepresentation is a fraud-related claim and it requires such allegations to be pled with specificity."  (*Id.*)  These arguments, if they had been properly raised in Naujok's Motion and fully briefed, may have had merit.  But as the motion papers currently stand, the Court has no reason to address these woefully deficient arguments.  *See Twilio, Inc.*, 249 F. Supp. 3d at 1162.

[22]     The California case that Plaintiff cites to demonstrate that California authority has held that CUTSA does not preempt an unfair competition claim under Section 17200 predates *Silvaco* and two of the three federal district court cases Plaintiff cites do not mention *Silvaco*.  (*See* Opp'n Naujok Mot. at 27–28); *see generally Courtesy Temp. Serv., Inc. v. Camacho*, 222 Cal. App. 3d 1278 (Ct. App. 1990); *Power Integrations, Inc. v. De Lara*, No. 20-cv-410-MMA (DEB), 2020 WL 4582675 (S.D. Cal. Aug. 10, 2020); *DJO Glob., Inc. v. Glader*, No. 3:16-cv-02208-CAB (NLS), 2016 WL 11622009 (S.D. Cal. Dec. 22, 2016).  The other case Plaintiff cites does not cite *Silvaco* in the unlawful competition law discussion and when that court does discuss *Silvaco*, it found that the question of supersession was better left to the summary judgment phase of the proceedings.  *See U.S. Legal Support, Inc. v. Hofioni*, No. CIV. S-13-01770 LKK/AC, 2013 WL 6844756, at *11, 14 (E.D. Cal. Dec. 20, 2013).

*AI Labs Inc.*, 2015 WL 5158461, at *2; *see also Waymo LLC v. Uber Techs., Inc.*, 256 F. Supp. 3d 1059, 1062 (N.D. Cal. 2017) (citing *Silavco* and noting that CUTSA "supersedes claims—including Section 17200 claims—based on the same nucleus of facts as trade secret misappropriation."). In fact, as discussed above, *see supra* p. 40, the majority of district courts to consider *Silvaco* have found that CUTSA supersedes claims based on the misappropriation of information even when that information does not satisfy the definition of a trade secret. The Court sees no reason to depart from these persuasive opinions. The Court therefore finds Plaintiff's unfair business practices claim premised on Defendants' use of the Channel Report preempted by CUTSA and **GRANTS** Naujok's Motion to Dismiss Plaintiff's unfair competition claim *based on trade secret misappropriation*.

As for Plaintiff's claim that Defendants' use of the Army Presentation Materials violates Section 17200, that claim is distinguishable from Plaintiff's claims for trade secret misappropriation and unjust enrichment: "there is a material distinction between the wrongdoing alleged in [the] CUTSA claim and that alleged in the non-CUTSA claim." *Becton, Dickinson & Co. v. Cytek Bioscis. Inc.*, No. 18-cv-00933-MMC, 2018 WL 2298500, at *5 (N.D. Cal. 2018) (quoting *SunPower Corp.*, 2012 WL 6160472, at *12). When stripped of facts supporting trade secret misappropriation, Plaintiff's claim that Defendants unfairly "palmed off the Army Presentation Materials as their own," (FAC ¶¶ 121, 124), survives because "the remaining factual allegations can be reassembled to independently support" a claim under Section 17200. *Swarmify, Inc.*, 2018 WL 1609379, at *2. Assuming Defendants (1) lawfully possessed the Army Presentation Materials, (2) there were no concerns about the use of non-trade secret confidential information, and (3) there were no concerns about the proper owner of the materials, Plaintiff's unfair business practices claim would survive CUTSA preemption because it is based on Defendants' unfair and deceptive use of those materials in implying Vector was the party servicing the United States Army. As pled, the allegations are sufficient to state an independent unfair competition claim that is not based on the same nucleus of facts as a trade secret misappropriation claim. *See Codexis, Inc. v. Enzymeworks, Inc.*, No. 16-cv-00826-WHO,

2016 WL 4241909, at *8 (N.D. Cal. Aug. 11, 2016); *see also Waymo LLC*, 256 F. Supp. 3d at 1062; *K.C. Multimedia, Inc.*, 171 Cal. App. 4th at 962.  The Court therefore finds that Plaintiff's unfair competition claim is not preempted by CUTSA to the extent it relies on Defendants' "palming off" of the Army Presentation Materials as their own.  The Court thus **DENIES** Naujok's Motion to Dismiss Plaintiff's *unfair competition claim based on the unfair and deceptive use of the Army Presentation Materials*.

Finally, Defendant Naujok seeks to dismiss Plaintiff's claim that Defendants used false and misleading statements about Genasys' products because "those allegations relate to entities and individuals other than Naujok." (Naujok Mem. at 27.)  Plaintiff argues that even though Gregory Almeida as a representative of Vector was the one who was caught disseminating the information to the Taiwanese Coast Guard, Naujok does not escape liability because he participated in creating the product comparisons that provided false information about Genasys' products and he inserted the Army Presentation Materials into Vector's presentation to the Taiwanese Coast Guard.  (Opp'n Naujok Mot. at 26–27.) Drawing all reasonable inferences in Plaintiff's favor, the First Amended Complaint sufficiently alleges that Naujok was involved in the conduct that forms the basis of Plaintiff's claim regarding misinformation.  The First Amended Complaint alleges that "[b]oth Lopez and Naujok participated in the creation of" Vector's presentation that included the Army Presentation Materials, (FAC ¶ 55) and "Lopez and Naujok prepared the Product Comparisons" that included misrepresentations about Genasys' products, (FAC ¶ 127).  At this stage in the proceedings, this is sufficient to survive Naujok's arguments for dismissal of that claim.  The Court therefore **DENIES** Naujok's Motion to Dismiss Plaintiff's *unfair competition claim based on Naujok's argument that the unfair competition allegations are not attributable to him*.

## CONCLUSION

For the foregoing reasons, the Court:

(1) **DENIES** Defendants Vector and Lopez's Motion to Dismiss Plaintiff's breach of contract claim as it relates to the PIIA;

(2) **GRANTS** Defendant Lopez's Motion to Compel Arbitration of Plaintiff's breach of contract claim as it relates to the Separation Agreement;

(3) **DENIES** Defendants Vector and Lopez's Motion for Attorneys' Fees; and

(4) **GRANTS IN PART AND DENIES IN PART** Defendant Naujok's Motion to Dismiss.

The Court also **GRANTS** Plaintiff leave to file a Second Amended Complaint addressing the above-enumerated deficiencies <u>within thirty (30) days of the date this Order is electronically docketed</u>.  Any motion to stay the case pending arbitration is due the same date if any of the Parties wish to file such a motion.  *Should Plaintiff elect not to file a timely amended complaint, this action will proceed as to the remaining causes of action. Should neither Party file a motion to stay, this action will proceed while Plaintiff's breach of contract claim as it relates to the Separation Agreement is resolved through arbitration.*

**IT IS SO ORDERED.**

Dated:  July 7, 2023

_____
Honorable Todd W. Robinson
United States District Judge